1    **WO**                                                                      JDN

2                              NOT FOR PUBLICATION

3

4

5

6                   IN THE UNITED STATES DISTRICT COURT

7                     FOR THE DISTRICT OF ARIZONA

8

9    Walter V. Rodenhurst, III,              )    No. CV 10-1237-PHX-GMS (MHB)
                                             )
10             Plaintiff,                     )    **ORDER**
                                             )
11   vs.                                      )
                                             )
12   State of Hawaii, et al.,                 )
                                             )
13             Defendants                     )
                                             )
14   _____         )

15          Plaintiff Walter V. Rodenhurst III brought this civil rights action under 42 U.S.C.

16   § 1983 against multiple State of Hawaii Defendants (Hawaii Defendants), Corrections

17   Corporation of American (CCA), and various CCA employees (Doc. 1).[1]  Before the Court

18   is the CCA Defendants' Motion for Summary Judgment (Doc. 295).

19          The Court will grant the Motion for Summary Judgment and dismiss the CCA

20   Defendants.  Claims against the Hawaii Defendants remain, and the Court will set a new

21   dispositive-motion deadline.

22   **I.     Background**

23           Plaintiff initiated this action in September 2008 in the District Court for the District

24   of Hawaii (Doc. 1).  His claims arose between 2002 through 2008 during his confinement

25   at two state facilities and two CCA facilities: (1) the Oahu Community Correctional Center

26   from December 2002-August 2003; (2) the Halawa Correctional Facility, also on Oahu, from

27   _____

28      [1]The Court dismissed the State of Hawaii as a Defendant for failure to state a claim and
     under Eleventh Amendment immunity (Doc. 229).

August 2003-April 2006; (3) CCA's Diamondback Correctional Facility (DCF) in Watonga, Oklahoma from April 2006-August 2007; and (4) CCA's Saguaro Correctional Center (SCC) in Eloy, Arizona from August 2007 to the present (id. ¶¶ 34, 57, 88, 111).

In his 45-page Complaint, Plaintiff set forth six causes of action alleging that Defendants violated his Eighth Amendment rights and state law when they failed to provide adequate medical care (id. ¶¶ 146-164). A seventh cause of action alleged that the CCA Defendants interfered with Plaintiff's access to the court (id. ¶¶ 165-168).

To summarize Plaintiff's allegations regarding his medical history from 2002 to the present, in late 2002, Plaintiff suffered abdominal pain and nausea and was diagnosed with gall stones (id. ¶¶ 31-32). He received gall stone surgery in January 2003 (id. ¶ 42). Following surgery, he was prescribed medication and a special therapeutic diet (id. ¶ 46). Plaintiff continued to suffer ongoing pain, nausea, diarrhea, and fever (id. ¶¶ 64-65). In February 2007, Plaintiff was diagnosed with diabetes (id. ¶ 103). Plaintiff's condition improved from January 2007-June 2007 primarily because his cellmate, Villegas, helped prepare Plaintiff's food and provided medical assistance (id. ¶¶ 102, 104). In July 2007, Plaintiff and Villegas were separated, and Plaintiff suffered increased bouts with pancreatitis and diminishing health (id. ¶¶ 107-109). Plaintiff was temporary placed back with Villegas in September-October 2007, during which time Plaintiff's health improved (id. ¶ 125). From February 2008 to the present, Plaintiff has suffered worsening kidney problems and experienced ongoing difficulties obtaining prescribed medication (id. ¶¶ 127, 136).

Plaintiff's medical-care claims concern Defendants' alleged failure to provide him with a prescribed therapeutic diet and to treat his pancreatitis and their denial of Plaintiff's request to see his private physician. In his access-to-court claim, Plaintiff alleged that SCC's law library lacked sufficient legal resources and that, pursuant to CCA policy, Defendants refused to provide him with the means to obtain attorney-contact information (id. ¶¶ 134, 165-168).

In January 2010, the Hawaii Defendants filed a Motion to Dismiss (Doc. 289), which was granted in part and denied in part and left the following claims: (1) the individual-

capacity claims against Hawaii Defendant Kay Bauman, M.D., for events arising after September 3, 2006; (2) the official-capacity claims for prospective injunctive relief against Hawaii Defendants for their alleged lack of oversight (pursuant to a CCA-State of Hawaii contract) as it relates to Plaintiff's confinement after he left the Hawaii facilities; and (3) the medical-care claims and access-to-court claims against the CCA Defendants (Doc. 316 at 22-23). In its Order on the Motion to Dismiss, the Hawaii District Court transferred the case to the District of Arizona (id.).

This Order addresses the Motion for Summary Judgment filed by CCA Defendants; thus, the motion addresses only those claims arising after April 2006, during Plaintiff's confinement at DCF and SCC (Doc. 295). The CCA Defendants are:

(1) CCA;

(2) Leeann Archuleta, SCC Chief of Unit Management;

(3) Lane Blair, CCA Warden;

(4) Jody Bradley, CCA Assistant Warden;

(5) Dianne Duffy, RN;

(6) Ben Griego, CCA Assistant Warden

(7) Muhammed Haleem, MD;

(8) Phyllis Hansen, RN;

(9) John Keesling, SCC Unit Manager;

(10) Anastacio Perez, CCA Assistant Warden;

(11) Gian Phan, MD;

(12) Dianne Pierson, CCA Assistant Warden;

(13) Patricia Sells, RN;

(14) Daren Swenson, CCA Warden; and

(15) Todd Thomas, CCA Warden (Doc. 295; see Doc. 1).

These CCA Defendants seek summary judgment on the grounds that there was no deliberate indifference to Plaintiff's medical needs, Plaintiff cannot establish a malpractice

1  claim or an access-to-courts claim, and he cannot recover emotional distress or punitive

2  damages (id.).[2]  Plaintiff opposes the motion (Docs. 318, 327).

3  **II.      Summary Judgment Standard**

4          A court must grant summary judgment "if the pleadings, the discovery and disclosure

5  materials on file, and any affidavits show that there is no genuine issue as to any material fact

6  and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see

7  also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).   Under summary judgment

8  practice, the movant bears the initial responsibility of presenting the basis for its motion and

9  identifying those portions of the record, together with affidavits, that it believes demonstrate

10  the absence of a genuine issue of material fact.  Celotex, 477 U.S. at 323; Devereaux v.

11  Abbey, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc).

12          If the movant meets its burden with a properly supported motion, the burden then

13  shifts to the nonmovant to present specific facts that show there is a genuine issue for trial.

14  Fed. R. Civ. P. 56(e); Auvil v. CBS "60 Minutes", 67 F.3d 816, 819 (9th Cir. 1995); see

15  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The nonmovant need not

16  establish a material issue of fact conclusively in its favor; it is sufficient that "the claimed

17  factual dispute be shown to require a jury or judge to resolve the parties' differing versions

18  of the truth at trial."  First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 288-89

19  (1968).  By affidavit or as otherwise provided by Rule 56, the nonmovant must designate

20  specific facts that show there is a genuine issue for trial.  Anderson, 477 U.S. at 249;

21  Devereaux, 263 F.3d at 1076.

22          At summary judgment, the judge's function is not to weigh the evidence and

23  determine the truth but to determine whether there is a genuine issue for trial.  Anderson, 477

24  U.S. at 249.  In its analysis, the court must believe the nonmovant's evidence, and draw all

25  inferences in the nonmovant's favor.  Id. at 255.

26  _____

27          [2]The Hawaii Defendants did not join CCA Defendants' motion or move separately for
   summary judgment.  Instead, they filed a notice indicating that they have "no opposition"
28  to CCA Defendants' Motion for Summary Judgment (Doc. 312).

1

**III.     Facts**

2      With their briefing, the parties each submit a separate statement of facts and

3  voluminous attachments.  Apart from the approximately 91 pages of briefing between the two

4  parties, they submit a total of 783 pages of exhibits (see Docs. 295-296, 302, 318-319, 327-

5  328, 330).[3]  Because the pending summary judgment motion concerns only those claims

6  arising after Plaintiff's transfer to DCF in 2007, only the facts and exhibits relevant to this

7  time period will be considered, unless otherwise noted.  Further, the Court refers to specific

8  documents cited within the briefing and will not comb through the evidence to find support

9  for respective arguments.  See Orr, 285 F.3d at 775 (citing Huey v. UPS, Inc., 165 F.3d 1084,

10  1085 (7th Cir.1999) ("judges need not paw over the files without assistance from the

11  parties")).

12      The parties' Statements of Facts set out the following facts, many of which are

13  disputed as noted:

14      Plaintiff was incarcerated at DCF from April 2006 to August 2007, and he was at SCC

15  from August 2007 to the present (Doc. 296, Defs.' Statement of Facts (DSOF) ¶ 1; Doc. 328,

16  Pl.'s Statement of Facts (PSOF) ¶ 1).

17      Defendants state that during his confinement at DCF, Plaintiff was prescribed and

18  served a special low sodium, low fat, low cholesterol diet that included white rice in lieu of

19  starches and no processed meats or dairy (DSOF ¶ 2).  Plaintiff states that he was prescribed

20  the special diet but he did not actually receive it (PSOF ¶ 2).

21      After his arrival at SCC in August 2007, Plaintiff was examined by Dr. Phan for

22  complaints of pancreatitis (DSOF ¶ 5; PSOF ¶ 5).  Plaintiff states that blood workup was

23  ────────────────────

24      [3]Defendants object to 30 of Plaintiff's exhibits on the grounds that they constitute
   hearsay, lack foundation, misstate the evidence, or are irrelevant (Doc. 319 at 5 n. 1; Doc.
25  330 at 3 n. 1).  The Court may not consider inadmissible or unsupported facts in its
   summary judgment analysis and therefore has not relied on any evidence that would not
26  be admissible at trial.  See Fed. R. Civ. P. 56(e); Orr v. Bank of Am., 285 F.3d 764, 773
   (9th Cir. 2002).   To the extent that any of Plaintiff's exhibits are inadmissible,
27  Defendants' objections are sustained; they are otherwise overruled.

28

1    delayed for eight days following this appointment with Dr. Phan (PSOF ¶¶ 5-6). Defendants

2    state that Dr. Phan consulted with Dr. Bauman, from the State of Hawaii Department of

3    Public Safety, regarding Plaintiff's medical history and reviewed Plaintiff's February 2006

4    CT scan (DSOF ¶ 6). According to Defendants, Dr. Phan concluded that Plaintiff did not

5    have pancreatitis and was likely malingering (id.). Plaintiff states that Dr. Phan's reference

6    to his 2006 CT scan is disingenuous because that scan does not support a normal finding

7    (PSOF ¶ 6). He further alleges that Dr. Bauman coerced and influenced Dr. Phan's diagnosis

8    of Plaintiff (id.).

9            Defendants state that even though Dr. Phan did not diagnose pancreatitis, he continued

10   to monitor Plaintiff and continued the previously ordered medications (DSOF ¶ 7).

11   Defendants also note that a subsequent CT scan, fecal fat tests, blood sugar tests, and serial

12   amylase/lipase tests conclusively established that Plaintiff did not suffer from pancreatitis

13   (id. ¶ 8). Plaintiff states that this subsequent CT scan was done without contrast and

14   therefore was less reliable than previous scans (PSOF ¶ 8). He further states that he was not

15   provided with the results of the fecal fat tests and that only 3 out of 23 labs were completed

16   (id. ¶¶ 7-8). Defendants state that during this testing Plaintiff often refused or delayed the

17   recommended workup (DSOF ¶ 9). Plaintiff asserts that he never delayed or refused workup

18   and that any problems were generated by Defendants' failure to prep Plaintiff properly, their

19   failure to coordinate conflicting appointment schedules, and their failure to secure samples

20   (PSOF ¶ 9).

21           Defendants assert that another CT scan was performed in January 2008; the results

22   showed a normal pancreas with no damage (DSOF ¶ 10). Plaintiff states that this CT scan

23   was either misinterpreted or invalid compared with the more than 6 other CT scans done

24   when he was in Hawaii (PSOF ¶ 10). Defendants state that in February 2008, Plaintiff's

25   enzyme levels were still normal, indicating no pancreatitis (DSOF ¶ 11). Plaintiff maintains

26   that at that time, he was not experiencing a pancreatic attack, and that pancreatitis waxes and

27   wanes over time (PSOF ¶ 11). Defendants state that from March-August 2008, Plaintiff

28   refused further testing for pancreatitis and did not submit any medical complaints about

1    abdominal pain (DSOF ¶¶ 12-13).  Plaintiff states that he refused further testing and refrained

2    from reporting complaints because Defendants were trying to "get around the original

3    agreement" consented to in September 2007,[4] and that he knew from past experience that

4    when he complained, he received no actual treatment other than Tylenol, which he already

5    had in his possession (PSOF ¶¶ 12-13).

6         Defendants state that by October 2008, Plaintiff's creatine and urine protein levels

7    were normal and his weight had slightly increased—indicating that his body was absorbing

8    food well; however, they continued to monitor Plaintiff's blood sugar and test his lipid levels

9    (DSOF ¶ 16).  Plaintiff states that a more reasonable explanation for his weight gain is

10   that—because he was not provided his prescribed medical diet—he was forced to eat food

11   high in fats and starches because those foods did not aggravate his pancreatitis (PSOF ¶ 16).

12   Defendants state that Plaintiff no-showed his medical appointment in November 2008, and

13   in December 2008, he refused blood testing (DSOF ¶ 17).  Plaintiff denies these statements;

14   he submits that it was Defendants who did not show up for the November appointment, and

15   the December appointment was for other tests, not for a blood draw (PSOF ¶ 17).

16        Defendants assert that in January 2009, Dr. Haleem prescribed Plaintiff a special low

17   fat, low salt, low cholesterol, high fiber diet for high cholesterol (DSOF ¶ 18).  Plaintiff states

18   that he does not know the reason Dr. Haleem prescribed the special diet, nor does he know

19   why the diet had been denied prior to January 2009 (PSOF ¶ 18).  Defendants state that this

20   special diet was discontinued in September 2009 due to Plaintiff's noncompliance with the

21   diet (DSOF ¶ 19).  Plaintiff confirmed that the diet was discontinued due to attendance

22   records; however, he asserts that discontinuing the medical diet for non-medical reasons

23   when there was no change in Plaintiff's medical status was unsound and contributed to his

24   suffering (PSOF ¶ 19).

25        On January 16, 2009, Plaintiff was sent to St. Mary's Hospital in Tucson for a

26   consultation with Dr. Cohn, a nephrologist, who diagnosed Plaintiff with Stage 3 chronic

27

28        [4]Plaintiff alleges that CCA physicians agreed to follow a treatment plan established by
     Plaintiff's primary care doctor in Hawaii following his 2003 surgery (Doc. 318 ¶ 22).

1   kidney disease and hyperuricemia; Dr. Cohn ordered a kidney ultrasound and enzyme and

2   blood work (DSOF ¶ 21).  Plaintiff notes that this consultation came five months after he

3   filed this lawsuit and just shy of two years after a DCF physician—Dr. Petry—indicated in

4   medical records that Plaintiff needed to see a nephrologist (PSOF ¶ 21).  The ultrasound of

5   Plaintiff's kidney was normal (DSOF ¶ 23; PSOF ¶ 23).

6   Defendants state that Plaintiff refused to attend a June 25, 2009 follow-up nephrology

7   appointment with Dr. Cohn (DSOF ¶ 24).  Plaintiff states that the cancellation was due to

8   facility scheduling that led to a conflict with an arranged legal call (PSOF ¶ 24).  Plaintiff

9   saw Dr. Cohn on August 27, 2009; because Plaintiff's lab results were normal, his diabetes

10  was well controlled, and his kidney functions were stable, Dr. Cohn concluded that Plaintiff

11  did not suffer from renal failure (DSOF ¶ 26).  Plaintiff asserts that Dr. Cohn's full diagnosis

12  noted "renal insufficiency" and a recommendation for Plaintiff to consult his own physician

13  upon release (PSOF ¶ 26).

14  Plaintiff continues to be seen in the Chronic Care Clinic every three months to

15  evaluate blood pressure, diabetes, and renal insufficiency (DSOF ¶ 26) by Nurse Practitioner

16  Bowden (PSOF ¶ 26).  During his confinement at DCF and SCC, Plaintiff has not been

17  hospitalized nor has he required admission to the infirmaries for any condition (DSOF ¶ 34;

18  PSOF ¶ 34).

19  With respect to the access-to-court claims, Defendants assert that the SCC law library

20  has computer kiosks for inmates to search Hawaii, Ninth Circuit, and Supreme Court case

21  law (DSOF ¶ 39; PSOF ¶ 39).  Plaintiff notes that Defendants cite cases not obtainable at the

22  kiosks and they have not responded to his requests for copies of those cases (PSOF ¶ 39).

23  **IV.    Eighth Amendment Claims**

24  **A.    Legal Standard**

25  To prevail on an Eighth Amendment medical care claim, a prisoner must demonstrate

26  "deliberate indifference to serious medical needs." Jett v. Penner, 439 F.3d 1091, 1096 (9th

27  Cir. 2006) (citing Estelle v. Gamble, 429 U.S. 97, 104 (1976)).  A plaintiff must show (1) a

28

1  "serious medical need" and (2) that the defendant's response to that need was deliberately

2  indifferent.  Jett, 439 F.3d at 1096 (citations omitted).

3       A "'serious' medical need exists if the failure to treat a prisoner's condition could

4  result in further significant injury or the 'unnecessary and wanton infliction of pain.'"

5  McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992), overruled on other grounds, WMX

6  Techs., Inc. v. Miller, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc) (internal citation

7  omitted).  Indications that a prisoner has a serious need for medical treatment include the

8  existence of an injury that a reasonable doctor or patient would find important and worthy

9  of comment or treatment, the presence of a medical condition that significantly affects an

10  individual's daily activities, or the existence of chronic and substantial pain.  McGuckin, 974

11  F.2d at 1059-60.

12       To act with deliberate indifference, a prison official must both know of and disregard

13  an excessive risk to inmate health; the official must both be aware of facts from which the

14  inference could be drawn that a substantial risk of serious harm exists, and he must also draw

15  the inference.  Farmer v. Brennan, 511 U.S. 825, 837 (1994).  In the medical context,

16  deliberate indifference may be shown by a purposeful act or failure to respond to a prisoner's

17  pain or possible medical need and harm caused by the indifference.  Jett, 439 F.3d at 1096.

18  Prison officials are deliberately indifferent to a prisoner's serious medical needs if they deny,

19  delay, or intentionally interfere with medical treatment.  Wood v. Housewright, 900 F.2d

20  1332, 1334 (9th Cir. 1990).  But a delay in providing medical treatment does not constitute

21  an Eighth Amendment violation unless the delay is harmful.  Hunt v. Dental Dep't, 865 F.2d

22  198, 200 (9th Cir. 1989) (citing Shapley v. Nevada Bd. of State Prison Comm'rs, 766 F.2d

23  404, 407 (9th Cir. 1985) (per curiam)).  To establish deliberate indifference, a prisoner must

24  show that the delay led to further injury.  See Hallett v. Morgan, 296 F.3d 732, 746 (9th Cir.

25  2002).

26       "[A] mere 'difference of medical opinion . . . [is] insufficient, as a matter of law, to

27  establish deliberate indifference.'"  Toguchi v. Chung, 391 F.3d 1051, 1058 (9th Cir. 2004)

28  (citation omitted).  Therefore, to prevail on a claim involving choices between alternative

1    courses of treatment, a prisoner must show that the course of treatment the doctors chose was

2    medically unacceptable in light of the circumstances and that it was chosen in conscious

3    disregard of an excessive risk to plaintiff's health.  Jackson v. McIntosh, 90 F.3d 330, 332

4    (9th Cir. 1996).

5         **B.    Analysis**

6         The first prong of the deliberate indifference analysis examines whether Plaintiff

7    suffered a serious medical need.  Estelle, 429 U.S. at 104.  Defendants acknowledge that the

8    medical issues that Plaintiff "came to [DCF] and SCC with or was diagnosed with while

9    there," included "pancreatitis, high cholesterol, diabetes and renal insufficiency" (Doc. 295

10   at 11).  And their own evidence demonstrates that medical personnel at DCF and SCC found

11   these conditions to be worthy of treatment (see Doc. 302, Ex. 2, Haleem Aff. ¶¶ 3-7).  Thus,

12   the first prong of the deliberate indifference test is met.

13        The Court next turns to the subjective prong—whether Defendants' response to

14   Plaintiff's serious medical need was deliberately indifferent.  See Jett, 439 F.3d at 1096.

15   Plaintiff's deliberate indifference claim encompasses two issues—the provision of a special

16   diet and his overall medical care.

17        **1. Diet**

18        The parties dispute whether Plaintiff actually received the prescribed special diet

19   during his confinement at DCF, which was from April 2006 to August 2007.  Plaintiff avers

20   that he did not receive the diet (Doc. 318 ¶ 10, Ex. 2, Attach. B2 & 11; see Ex. 1, Pl. Aff.

21   ¶¶ 2-5).  Assuming the truth of this averment, the next question is whether failure to provide

22   the prescribed special diet implicated the Eighth Amendment.

23        Plaintiff alleges that the failure to provide him with the proper special diet contributed

24   to his development of diabetes and renal problems (Doc. 327 at 4).  Yet the evidence Plaintiff

25   cites does not support this allegation or provide any facts from which such an inference could

26   be made.  Neither the medical records from Dr. Cohn's 2009 consultations (Doc. 318, Attach.

27   27) nor the affidavits of Dr. Iwanuma or dietician Claire Hughes make any connection

28   between the diet Plaintiff received and subsequent diabetic or renal problems (id., Ex. 3,

Iwanuma Aff. at 1-2, Ex. 4, Hughes Aff. ¶¶ 5-7).  Plaintiff also references the medical notes from January 17 and March 7, 2007 (Doc. 327 at 4); however, neither of these records support a conclusion that his diet caused additional medical problems (Doc. 302, Ex. 2B). Indeed, the March 7, 2007 medical note states that the diet Plaintiff was receiving at that time was adequate to accomplish the stated health goals given that Plaintiff was not eating the processed meats provided in some of the meals (id. (medical note dated March 7, 2007)).

A review of the medical records from the relevant time shows that Plaintiff complained to medical that he was not receiving the proper diet and that medical personnel responded to his complaints by, for example, adjusting the special-diet orders and seeking approval for diet changes from the Warden (Doc. 302, Ex. 2, Attach. 2B (notes dated July 20, 2006; Sept. 22, 2006)).  The records also show that by November 2006, Plaintiff reported that he felt well despite some ongoing inconsistency with his dinner-time meals (id. (note dated Nov. 14, 2006)).   In January 2007, he reported that he felt generally well though the diet was "still a problem, but better" (id. (note dated Jan. 17, 2006)).   In March 2007, Plaintiff's diet was "more consistent" and he was not experiencing abdominal pain or bowel changes (id. (note dated March 7, 2007)).  And in April 2007, Plaintiff reported feeling well and "getting diet consistently" (id. (note dated April 18, 2007)).

This undisputed evidence demonstrates that Plaintiff did not consistently receive the proper diet at DCF; however, it belies any claim that he *never* received the proper diet.  More importantly, the medical evidence does not reflect that Plaintiff suffered harm as a result of the inconsistencies in his diet.  Absent such a showing of harm, Plaintiff cannot establish deliberate indifference.  See Jett, 439 F.3d at 1096.  Moreover, the fact that medical personnel responded to Plaintiff's diet concerns precludes a finding of deliberate indifference.  See Farmer, 511 U.S. at 837 (defendants are deliberately indifferent if they know of a risk to the plaintiff's health but fail to act in disregard of that risk).

Plaintiff's initial diet allegation arising from his SCC confinement is that he was not prescribed a special diet when he should have been.  This claim pertains to the period of time from his arrival at SCC in August 2007 until he was prescribed a special diet in January

2009, and the period following the September 2009 discontinuation of the special diet.

The evidence demonstrates that Plaintiff arrived at SCC with a special-diet order that had been prescribed by Dr. Petry at DCF (Doc. 302, Ex. 2, Haleem Aff. ¶ 8, Attach. 2B). According to the medical records, upon examination of Plaintiff just weeks after his arrival, and after a review of Plaintiff's medical history and consultation with Dr. Bauman in Hawaii, Dr. Phan made the medical decision to remove Plaintiff from the special diet (id. ¶ 9, Attach. 2B (note dated Sept. 4, 2007)). Plaintiff does not present any evidence or specific allegations demonstrating that Phan discontinued the medical diet in conscious disregard of Plaintiff's health.[5] Plaintiff also argues that there was no medical reason to discontinue his prescribed diet in September 2009, but his evidence to support this argument is merely the memorandum from Nurse Sells informing Plaintiff that the diet will be stopped due to his noncompliance (id., Attach. 17).

Alternatively, Plaintiff contends that the special diet he received in 2009 was inadequate (Doc. 318 ¶ 35). He relies on the affidavit of Claire Hughes, a dietitian who worked with Dr. Iwanuma in 2006 to develop a meal plan for Plaintiff (Doc. 318, Ex. 4, Hughes Aff. ¶¶ 1, 3-4). Hughes provides her opinion with respect to the meals served to Plaintiff in 2009 when he was on the prescribed diet, and she attests that those meals did not appear to comply with the therapeutic diet recommended by Dr. Iwanuma in 2006 (id. ¶ 7). There is no evidence, however, that Plaintiff's health condition and dietary needs in 2006 were the same as in 2009, nor does Hughes opine that the diet served was nutritionally inadequate or inappropriate. And there is no dispute that Plaintiff has not seen Dr. Iwanuma since March 2006 (Doc. 296, DSOF ¶ 38; Doc. 328, PSOF ¶ 38). Nor does, Plaintiff deny that he was noncompliant with the 2009 special diet (Doc. 328, PSOF ¶ 19).

Plaintiff maintains that his claim against CCA Defendants for denial of a special diet

---

[5]Plaintiff asserts that Dr. Phan actually continued to order the special diet, but the evidence Plaintiff proffers to support his assertion—a February 1, 2008 "Diabetic Chronic Care Clinic" form—provides no indication that a special diet was to be continued or ordered (Doc. 318, Attach. 12).

1    is not just a disagreement about the proper course of treatment; he argues that given his

2    medical conditions, it was standard for any medically trained professional to prescribe a

3    special diet, just as previous physicians have done (Doc. 318 ¶ 23).  But Plaintiff proffers no

4    evidence beyond his opinion on this point.  As noted, he submits no expert testimony to

5    challenge the medical evidence and opinions of the SCC medical staff.  Instead, Plaintiff

6    asserts that "CCA Defendants Blair, Perez, Pierson, Hansen, Duffy, Swenson, Thomas,

7    Greigo, Bradley, Phan, Haleem, Archuleta, Vantel, Keesling and Sell were made aware of

8    the very same problem [inadequate diet] and had a duty to act to correct or transfer Plaintiff

9    to a facility that could comply" (Doc. 318 ¶ 35).  This conclusory allegation that CCA

10   Defendants acted with deliberate indifference, without any specific facts or evidence, is

11   insufficient to prevent summary judgment.  Leer v. Murphy, 844 F.2d 628, 634 (9th Cir.

12   1988) ("[s]weeping conclusory allegations will not suffice to prevent summary judgment";

13   the plaintiff must identify "specific facts as to each individual defendant's deliberate

14   indifference"); see also Hutchinson v. United States, 838 F.2d 390, 393 (9th Cir. 1988)

15   (granting summary judgment against a plaintiff who relied only on her own allegations and

16   conclusory statements that defendants had been negligent and who failed to provide

17   affidavits or depositions of experts).

18        Finally, to the extent that Plaintiff alleges official-capacity liability by CCA or any

19   CCA Defendant based on an unlawful diet policy at either DCF or SCC, his claim fails.  To

20   show official-capacity liability, Plaintiff must demonstrate that actions taken pursuant to an

21   official policy or custom caused a constitutional violation.  Berry v. Baca, 379 F.3d 764, 767

22   (9th Cir. 2004) (citing Monell, 436 U.S. at 694); see also Long v. County of L.A., 442 F.3d

23   1178, 1186 (9th Cir. 2006) (the plaintiff must show that an unlawful custom or policy was

24   the moving force behind the constitutional violation).  Here, Plaintiff does not identify any

25   unlawful diet policy at DCF or SCC.  Absent a constitutional violation, summary judgment

26   must be granted on Plaintiff's official-capacity claims stemming from an alleged unlawful

27   policy.

28

## 2.  Overall Medical Care

Plaintiff also alleges that his medical care was inadequate and, in particular, that CCA Defendants failed to properly diagnose and treat his pancreatitis (see Doc. 327 at 3-4).

Defendants' evidence includes copies of Plaintiff's medical records from April 2006 through December 2009 (Doc. 302, Ex. 2, Haleem Aff. ¶ 7, Attach. 2B).[6]  These records reflect that Plaintiff received regular and continuous treatment and testing throughout his confinement (see id.).  With respect to Dr. Phan's determination in September 2007 that Plaintiff did not suffer from pancreatitis, Defendants demonstrate that this conclusion was made only after a physical examination, a review of Plaintiff's prior medical history and test results, and consultation with Dr. Bauman, who was familiar with Plaintiff's condition (id. ¶ 9, Ex. 2B).  Plaintiff presents no evidence to show that Dr. Phan's treatment was medically unacceptable or that his medical determination was made in disregard of Plaintiff's circumstances.  See Jackson, 90 F.3d at 332.  Plaintiff objects to Dr. Phan's reliance on Dr. Bauman's statements that he did not have pancreatic insufficiency and was malingering (Doc. 328, PSOF ¶ 6).  But even assuming that Dr. Bauman was misrepresenting Plaintiff's medical status, there is nothing to suggest that Dr. Phan should have known that or that it was unreasonable for him rely on a former treating physician's opinion.  Plaintiff further disagrees with Dr. Phan's opinion that the 2006 CT scan showed a normal pancreas (id.).  Plaintiff points to the CT scan report; however, it is not clear from the face of the document what the proper medical interpretation should be (Doc. 328, Attach. A).  And Plaintiff offers no expert medical evidence to show that Dr. Phan's reading of this or any other test result was incorrect, much less deliberately incorrect.

The record shows that despite his conclusion that there was no pancreatitis, Dr. Phan

---

[6]Plaintiff argues that Dr. Haleem's affidavit is insufficient because Haleem was not privy to all conversations concerning Plaintiff's care, and Plaintiff asserts that the records themselves do not accurately reflect communications between Plaintiff and Drs. Bauman, Phan, and Iwanuma (Doc. 327 at 6).  This objection is overruled; Dr. Haleem's affidavit is supported by the attached medical records, and the medical records are admissible under the business-records exception to the hearsay rule.  Fed. R. Evid. 803(6).

1    continued Plaintiff's medications and performed further tests, and Plaintiff was regularly

2    seen in medical—at least every month—for a variety of tests, labs, and scans to monitor his

3    condition (Doc. 302, Attach. 2B).  Plaintiff's disagreement with the efficacy of fecal-fat tests

4    or other lab tests is insufficient to demonstrate deliberate indifference.  See Toguchi, 391

5    F.3d at 1058.

6         Even though a prisoner does not have an independent constitutional right to outside

7    medical care additional to the care provided by the prison medical staff, at Plaintiff's request,

8    Dr. Phan spoke with Dr. Iwanuma to discuss Plaintiff's condition (Doc. 302, Ex. 2B (note

9    dated Oct. 8, 2007); Doc. 318, Ex. 3 Iwanuma Aff. at 2).  Roberts v. Spalding, 783 F.2d 867,

10   870 (9th Cir. 1986).  But contrary to Plaintiff's assertion, there is nothing to show that Dr.

11   Phan or any other CCA physician entered an agreement to follow a specific treatment plan

12   prescribed by Dr. Iwanuma.[7]  Plaintiff subsequently received care from a specialist, and he

13   continues to receive regular care and monitoring (Doc. 296, DSOF ¶¶ 20, 26; Doc. 328,

14   PSOF ¶¶ 20, 26).  Although Plaintiff was diagnosed with kidney disease in 2009, the medical

15   evidence demonstrates that his kidney functions are stable and his diabetes is well controlled,

16   as is his cholesterol and renal status (id. ¶¶ 33, 40).  Plaintiff presents no probative evidence

17   to show that his kidney disease or diabetes was caused by or aggravated by the care or the

18   treatment decisions made at DCF or SCC.

19        On this record, Plaintiff merely presents a difference of opinion about his medical

20   care, which does not rise to a constitutional violation.  See Toguchi, 391 F.3d at 1058.

21   Plaintiff's  speculation and assertions as to the proper course of treatment simply do not

22   create a disputed issue of fact sufficient to defeat summary judgment.  See Hutchinson, 838

23   F.2d at 393; see also Shakur v. Schriro, 514 F.3d 878, 890 (9th Cir. 2008) (conclusory

24   affidavits that do not affirmatively show personal knowledge are insufficient).

25

26        [7]The evidence Plaintiff cites in support of this assertion fails to demonstrate that there
     was any agreement (see Doc. 328, PSOF ¶ 12, citing Doc. 318, Ex. 3, Iwanuma Aff.;
27   Attachs. 3-4 (notes dated Oct. 8 and 29, 2007); Ex. 2, Attach. to Aff. of G. Rodenhurst
     (Pl.'s Sept. 18, 2007 "journal entry"); Doc. 328, Attach. I (notes from Sept. and Oct.
28   2007)).

In addition, even if there was a material factual question whether Plaintiff's medical care constituted deliberate indifference, there is nothing to establish liability for any of the named Defendants. The Court has found that Dr. Phan's conduct was not unconstitutional, and Plaintiff fails to demonstrate that any other individual Defendant's purposeful conduct caused Plaintiff harm. McGuckin, 974 F.2d at 1060; Shapley, 766 F.2d at 407; see also Leer, 844 F.2d at 634. Plaintiff's contention that other Defendants are liable because they responded to grievances is unavailing without more specific facts showing unconstitutional behavior. See Shehee v. Luttrell, 199 F.3d 295, 300 (6th Cir. 1999) (where the defendants did not participate in the underlying violation and their "only roles in [a civil rights] action involve the denial of administrative grievances or the failure to act . . . they cannot be liable under § 1983"). Also, as with Plaintiff's diet claim, because there is no underlying constitutional violation, any official-capacity claim based on an alleged unlawful medical-care policy fails.

Accordingly, summary judgment will be granted as to the Eighth Amendment claims against CCA Defendants.

## V.    State-Law Claims

Plaintiff alleges that CCA Defendants' provision of medical care at DCF in Oklahoma and at SCC in Arizona constituted medical negligence in violation of state law (see Doc. 1). He further alleges that CCA Defendants violated his statutory right to see a private doctor (Doc. 327 at 5).

### A.    Legal Standard

When a district court exercises supplemental jurisdiction over state law claims, it applies the choice-of-law rules of the forum state. Paulsen v. CNF Inc., 559 F.3d 1061, 1080 (9th Cir. 2009). But after a transfer pursuant to 28 U.S.C. § 1404(a), "the transferee district court generally must apply the state law that the transferor district court would have applied had the case not been transferred." Shannon-Vail Five Inc. v. Bunch, 270 F.3d 1207, 1210 (9th Cir. 2001); see Van Dusen v. Barrack, 376 U.S. 612, 639 (1964) ("[a] change of venue under § 1404(a) generally should be, with respect to state law, but a change of courtrooms").

1    This case was transferred from the District of Hawaii pursuant to § 1404(a); therefore,

2    Hawaii law should guide the court's choice-of-law analysis (see Doc. 316 at 18-19).

3         Under Hawaii choice-of-law rules, the Court looks "to the state with the most

4    significant relationship to the parties and subject matter." Roxas v. Marcos, 969 P.2d 1209,

5    1235 n. 16  (Haw. 1998).  This determination requires consideration of factors such as (1)

6    where relevant events occurred, (2) the residence of the parties, and (3) whether any of the

7    parties had any particular ties to one jurisdiction or the other.  See id.  The Court also looks

8    to the Restatement (Second) of Conflicts of Laws, which provides that tort liability is

9    determined by "the local law of the state where the injury occurred," unless another state as

10   a more significant relationship.  Restatement 2d § 146; see UARCO Inc. v. Lam, 18 F. Supp.

11   2d 1116, 1123 (D. Haw. 1998).

12                    **B.    Medical Negligence Claims**

13        Applying the relevant factors in this case, the Court finds that Oklahoma has the more

14   significant relationship to the medical negligence claims alleged at DCF and Arizona has the

15   more significant relationship to the medical negligence claims alleged at SCC.  This Court

16   thus applies the respective laws of each state to the Plaintiff's medical negligence claims.

17        Oklahoma law generally requires expert testimony to establish the standard of care.

18   Okla. Stat. tit. 76, § 21; see Fitzgerald v. CCA, 403 F.3d 1134, 1144 (10th Cir. 2005); Harder

19   v. F.C. Clinton, Inc., 948 P.2d 298, 305 n. 30 (Okla. 1997) (ordinarily, negligence must be

20   established by expert medical testimony; however, if the lack of care "is so grossly apparent

21   that laymen would have no difficulty in recognizing it," expert medical testimony is not

22   needed).  Similarly, Arizona law requires that in medical malpractice and negligence cases,

23   the plaintiff must present expert medical testimony to establish the general standard of care

24   and that the defendant deviated from that standard.  Ariz. Rev. Stat. § 12-563; Potter v. H.

25   Kern Wisner, M.D., 823 P.2d 1339, 1341 (Ariz. Ct. App. 1991).

26        Plaintiff's claim that Defendants prevented him from obtaining an independent review

27   of the medical care he received is belied by the affidavit he proffers from Dr. Iwanuma,

28   which is dated January 27, 2009 (Doc. 327 at 5; Doc. 318, Ex. 3, Iwanuma Aff. at 2).  This

1   evidences that Plaintiff was able to communicate with an outside provider and Plaintiff had

2   access to his medical records that he could have forwarded to Iwanuma or another doctor for

3   review (see id., Attachs.).

4        In his affidavit, Dr. Iwanuma states:

5        In my medical opinion [Plaintiff] should have regular medical visits with a
         primary care physician (PCP) and a problem list developed after appropriate
6        workup.   These basic investigations include but are not limited to his
         pancreatic status, chronic kidney disease and its numerous metabolic
7        complications, lactose intolerance and hypertension . . . . [T]he PCP can then
         make referral to medical specialists such as a gastroenterologist and
8        nephrologist as necessary . . . . [M]edical treatment should deliver proper diets,
         medications, exercise, weight control and follow up in a prison facility with
9        such capabilities (Doc. 318, Ex. 3, Iwanuma Aff. at 2).

10  Dr. Iwanuma describes a very general, overall standard of care but does not describe

11  the specific degree of care and treatment required for the specific maladies that

12  Plaintiff suffered.  Nonetheless, if this testimony were accepted as establishing the

13  relevant standard of care in this case, it fails to meet the statutory requirements to also

14  show that a Defendant violated that standard and thereby caused an injury to

15  Plaintiff.[8]  See Okla. Stat. tit. 76, § 21; Ariz. Rev. Stat. § 12-563.  Dr. Iwanuma does

16  not provide an opinion that the care actually provided fell below an acceptable degree

17  of care or that it was the proximate cause of an injury.  Consequently, Plaintiff fails

18  to meet either the Oklahoma or Arizona state-law requirements to maintain a medical

19  negligence claim and therefore fails to demonstrate the existence of a material factual

20  dispute on these claims.  See Gurr v. Willcutt, 707 P.2d 979, 985 (Ariz. Ct. App.

21  1985) (the requirements under § 12-563 must be proven to withstand summary

22  judgment).

23       **C.    State Right to Private Doctor**

24       Hawaii Revised Statute § 353-13.5 provides that inmates have the right to

25

26  _____

27  [8]The Court notes that Plaintiff received regular visits with a PCP, that he was referred
    to a nephrologist, and that he currently receives medications and monitoring as necessary.
28  Thus, the evidence shows that CCA Defendants met the standard of care as described by
    Dr. Iwanuma.

retain a private doctor for medical care (Doc. 327 at 5).  CCA Defendants present no argument regarding whether this statute may be invoked during Plaintiff's confinement at CCA facilities in Oklahoma and Arizona (Doc. 330 at 8-9).  Instead, they argue that pursuant to § 353-13.5, they responded to Plaintiff's requests and informed Plaintiff that he could not return to Hawaii due the distance but he could see a private physician in Arizona at his own expense (Doc. 330 at 8; Doc. 328, Ex. F).[9] They maintain that Plaintiff did not subsequently seek private care (Doc. 330 at 8-9).

Plaintiff counters that Defendants prevented him from seeing his private physician (Doc. 327 at 5).  He submits a copy of Hawaii's Department of Public Safety Corrections Administrative Policy governing inmate requests for private medical care (Doc. 328, Ex. F).  The policy explains that to obtain care from a private physician, the inmate must have the private provider contact the facility health authority to make arrangements to examine the inmate (id., § 4.0 (5)).  Also, under the statute and the policy, inmates are responsible for all costs associated with any private care, including transportation, and they must verify their financial standing to the facility to qualify for private care (id. §§ 4.0(1)(b), (3), (4) and (6)).

Plaintiff's own evidence shows that he failed to comply with the policy.  The documentation relevant to DCF and SCC reflects that Plaintiff requested that each facility make an appointment and arrangements for Plaintiff to be seen by his private doctor (Doc. 328, Ex. F (Dec. 14, 2006 letter to DCF; Aug. 19, 2008 Memo. from SCC regarding Pl's request)).  There is no evidence that Dr. Iwanuma or another private doctor contacted either facility to make arrangements or that Plaintiff verified his financial ability to pay for such arrangements.  Notably, Dr. Iwanuma's January 2009 affidavit makes no mention of a request to examine Plaintiff or that he

---

[9]Defendants also argue that this was not a claim originally raised by Plaintiff (Doc. 330 at 8).  Although the Complaint does not cite to Haw. Rev. Stat. § 353-13.5, it includes allegations that Plaintiff requested DCF personnel to make arrangements to transport him to see Dr. Iwanuma (Doc. 1 ¶ 101).

1   previously attempted to make arrangements to see Plaintiff (see Doc. 318, Ex. 3,

2   Iwanuma Aff.).  Without evidence that Plaintiff qualified to obtain private care under

3   the statute and policy, this state-law claim cannot survive summary judgment.

4          In light of the above, summary judgment will be granted on all state-law claims

5   against CCA Defendants.

6   **VI.    Access-to-Court Claim**

7          **A.    Legal Standard**

8          Inmates have a fundamental constitutional right of access to the courts.  Lewis

9   v. Casey, 518 U.S. 343, 346 (1996).  There is no right, however, to a law library or

10  to legal assistance.  Id. at 350.  The right of access to the courts is only a right to bring

11  petitions or complaints to the federal court and not a right to discover such claims or

12  even to litigate them effectively once filed with a court.  See id. at 354; see also

13  Cornett v. Donovan, 51 F.3d 894, 898 (9th Cir. 1995).  To maintain an access-to-the-

14  courts claim, the plaintiff must submit evidence showing an "actual injury" resulting

15  from the defendants' actions.  See Lewis, 518 U.S. at 349.  With respect to an existing

16  case, the actual injury must be "actual prejudice . . . such as the inability to meet a

17  filing deadline or to present a claim."  Id.  at 348-49.

18         **B.    Analysis**

19         Plaintiff asserts that (1) SCC's mailing procedures and lock downs hindered

20  timely access to the court, (2) Defendants' harassment effectively blocked his access

21  to the court, and (3) even though he had access to some legal materials, Defendants

22  prevented him from obtaining case law that he needed to support his case and as a

23  result, his motion for injunctive relief was denied (Doc. 318 ¶¶ 20-21; Doc. 327

24  at 12).

25         Plaintiff provides no facts about lock downs at SCC or about SCC's mailing

26  procedures and how those procedures impacted his lawsuit.  He attaches Inmate

27  Request Forms and the responses thereto concerning newspaper clippings that were

28  withheld from him and a three-week delay in mailing one of Plaintiff's parcels to

1  Hawaii (Doc. 318, Attach. 23).  This evidence does not support his access-to court

2  claim.  Nor does Plaintiff present any specific facts or evidence to show that

3  Defendants harassed him and prevented him from filing court documents.[10]  <u>See</u>

4  <u>Celotex</u>, 477 U.S. at 324 (nonmovant must "go beyond the pleadings . . . and

5  designate specific facts showing" a genuine issue of material fact).

6        On this record, there is no material factual dispute concerning Plaintiff's access

7  to the court.  Defendants were not obligated to provide Plaintiff with copies of every

8  case he requested.  And Plaintiff makes no showing that Defendants' actions

9  prevented him from presenting a complaint to court or otherwise caused any actual

10  injury.  That Plaintiff's motion for injunctive relief was denied is not evidence of

11  actual injury.  And Plaintiff's numerous filings contradict any claim that he is unable

12  to communicate with the court.  Summary judgment will therefore granted on

13  Plaintiff's access-to-court claim against CCA Defendants.

14        In light of the Court's finding that summary judgment is appropriate on all

15  claims against CCA Defendants, the parties' arguments on damages need not be

16  addressed.

17  **VII.   Remaining Claims**

18        The remaining claims are (1) the individual-capacity claims against Dr.

19  Bauman arising after September 3, 2006, and (2) the official-capacity claims for

20  prospective injunctive relief against Hawaii Defendants for their alleged lack of

21  oversight over Hawaii inmates pursuant to the CCA-Hawaii contract.[11]  The status of

22

23     [10]Plaintiff refers to the testimony he presented in opposition to Defendants' motion to

24  dismiss for nonexhaustion and the Order denying that motion (Doc. 327, citing Docs. 217, 229).  That opposition brief includes 240 pages of exhibits, and the Court's Order is 32-

25  pages long, yet Plaintiff does not specifically cite to any page or portion within these documents that might support his access-to-court claim (<u>see</u> Docs. 217, 229).  <u>See</u> <u>Huey</u>,

26  165 F.3d at 1085.

27     [11]The Hawaii Defendants are Dr. Bauman, Kenneth Zienkiewicz, Frank Lopez, Clayton

28  Frank, Wesley Num, Doris Robinson, Nolan Uehara, Eric Tanaka, Nathalie Kodama, David Saldana, Carmillo Santiago, Mary Tummenillo, John Ioane, Howard Komori, Burt

these claims is unclear after this Order's conclusions regarding the medical care provided at DCF and SCC. But these claims were not addressed in CCA Defendants' Motion for Summary Judgment, and neither Dr. Bauman nor the other Hawaii Defendants moved for summary judgment. "Sua sponte grants of summary judgment are only appropriate if the losing party has 'reasonable notice that the sufficiency of his or her claim will be in issue.'" Greene v. Solano County Jail, 513 F.3d 982, 990 (9th Cir. 2008) (internal citation omitted). This is particularly true when the opposing party is a pro se plaintiff, who cannot be expected to anticipate and oppose arguments that a defendant does not make. Id.; see Keller v. Golden Corral Franchising Sys., Inc., 359 Fed. Appx. 716, 718 (9th Cir. 2009) (unpublished) (reversing sua sponte grant of summary judgment where the defendants did not raise ground for judgment on contract claims and the plaintiffs were otherwise given no reasonable notice that claims were at issue); Hoffman v. Shytle, 324 Fed. Appx. 634, 635 (9th Cir. 2009) (unpublished) (in pro se prisoner action, vacating summary judgment as to one defendant because that defendant never moved for summary judgment).[12] Because Plaintiff had no notice that the Court might consider summary judgment on these other claims, they are not addressed herein.

**IT IS ORDERED:**

(1) The reference to the Magistrate Judge is **withdrawn** as to CCA Defendants' Motion for Summary Judgment (Doc. 295).

(2) CCA Defendants' Motion for Summary Judgment (Doc. 295) is **granted**.

(3) CCA, Archuleta, Blair, Bradley, Duffy, Griego, Haleem, Hansen, Keesling, Perez, Phan, Pierson, Sells, Swenson, and Thomas are **dismissed** as Defendants.

(4) The remaining claims are (a) the individual-capacity claims against Dr.

Santiago, June Tavares, and Shari Kimoto.

---

[12] Cases cited pursuant to Ninth Circuit Rule 36-3, which provides for citations to unpublished dispositions issued on or after January 1, 2007.

Bauman, for those claims arising after September 3, 2006, and (b) the official-capacity claims for prospective injunctive relief against Hawaii Defendants for their alleged lack of oversight over Hawaii inmates pursuant to the CCA-Hawaii contract.

(5) Within **30 days** from the date of this Order, the parties may file summary judgment motions as to the remaining claims.  The parties are reminded that any filings must comply with the Local Rules of Civil Procedure for the District of Arizona.

(6) Absent extraordinary circumstances, no extensions to this briefing deadline will be permitted.

DATED this 15th day of September, 2010.

G. Murray Snow
United States District Judge